

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN       AUSTIN 11, TEXAS
~~XXXXXXXXXXXX~~PPERID
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:        Opinion No. O-4819

           Re:   (a) Is the Cathey & Carrell
                Truck Line liable for the tax
                levied under Section 1 of Arti-
                cle XIV, House Bill 8, Acts
                of the Regular Session of the
                Forty-Seventh Legislature?
                (b) If not, is the Comptroller
                authorized to refund the tax
                paid by this truck line under
                protest?

       Your request for opinion, dated September 1, 1942,
has been received and considered by this department. We
quote from your letter of request as follows:

       "Cathey & Carrell Truck Line, operating as
interstate truck operators with an interstate
certificate Contract Motor Carrier Permit, haul
merchandise from out of State for A & P Tea Com-
pany to the A & P Tea Company warehouse in Dal-
las, Texas and from there the merchandise is re-
loaded into a truck of Cathey & Carrell Truck
Line and hauled to various stores within the State
of Texas. The Cathey & Carrell Truck Line does
not have a certificate of convenience and neces-
sity from the Texas Railroad Commission.

       "The above named truck line contend they
are not liable for the tax levied under Section
1 of Article XIV, House Bill No. 8 of the Forty-
seventh Legislature, but have paid same under
protest and now request that this tax be refunded,
and in support of such request have filed their
brief of the law.

"I am enclosing the brief for your considera-
tion and respectfully request your opinion as to
whether the tax accrues against this truck line
and whether this department would be authorized
to refund the tax paid by this truck line under
protest before suit is filed."

Article 7057b of Vernon's Annotated Civil Statutes
provides:

"Sec. 1. Any person, firm or corporation who
may be required to pay to the head of any depart-
ment of the State Government any occupation, gross
receipt, franchise, license or other privilege tax
or fee, and who believes or contends that the same
is unlawful and that such public official is not
lawfully entitled to demand or collect the same shall,
nevertheless, be required to pay such amount as such
public officials charged with the collection there-
of may deem to be due the State, and shall be en-
titled to accompany such payment with a written pro-
test, setting out fully and in detail each and every
ground or reason why it is contended that such de-
mand is unlawful or unauthorized.

"Sec. 2. Upon the payment of such taxes or
fees, accompanied by such written protest, the
tax-payer shall have ninety (90) days from said
date within which to file suit for the recovery
thereof in any court of competent jurisdiction
in Travis County, Texas, and none other. Such suit
shall be brought against the public official charged
with the duty of collecting such tax or fees, the
State Treasurer and the Attorney General. The is-
sues to be determined in such suit shall be only
those arising out of the grounds or reasons set
forth in such written protest as originally filed.
The right of appeal shall exist as in other cases
provided by law. . . .

"Sec. 2a. After such suit is filed in a Court
of competent jurisdiction in Travis County, and
before such suit is tried by said Court, said tax-
payer pays additional taxes under protest, the
grounds of protest being the same as in the origi-
nal petition filed in said Court, and the total of

said taxes exceeds the jurisdiction of said Court, then the tax-payer will be authorized to file suit within ninety (90) days after the payment of such additional taxes in a Court in Travis County which has jurisdiction of the total amount of said taxes paid under protest, and when such suit is filed it shall be deemed to have been filed in conformity with the provisions of this Act; provided further, that a tax-payer may amend his original petition setting up such additional taxes paid under protest, and such amendment, if filed within ninety (90) days after the date of payment of such additional taxes under protest, shall not be considered a new cause of action. Provided further, that if an appeal is taken from the final judgment rendered in such suit, the tax-payer will not be relieved of the duty of continuing paying said taxes under protest pending the appeal of said case; however, it will not be necessary for such tax-payer to file suit within ninety (90) days after the payment of such taxes, but the disposition of such taxes shall be governed by the outcome of the original suit.

"Sec. 2b. The provisions of this Act shall apply to all taxes paid under protest, and which taxes have not been finally determined to belong to the State.

"Sec. 3. It shall be the duty of such public official to transmit daily to the State Treasurer all money so received, with a detailed list of all those remitting same, and he shall inform the State Treasurer in writing that such money was paid under protest as hereinabove provided. A deposit receipt shall be issued by the Comptroller for the daily total of such remittances from each department; and the cashier of the Treasury Department shall keep a cash book to be called 'Suspense Cash Book', in which to enter such deposit receipts. Upon the receipt of such money by the State Treasurer it shall be his duty and he is hereby required to immediately and forthwith place the same in State depositories bearing interest in the same manner as any other funds of the State required to be placed in such depositories at interest, and the

State Treasurer shall further be required to allocate whatever interest is earned on such funds and to credit the amount thereof to such suspense account until the status of such money is finally determined as herein provided.

"Sec. 4. If suit is not brought within the time and within the manner herein provided, or in the event it finally be determined in such suit that the sums of money so paid or any portion thereof, together with the pro rata interest earned thereon, belong to the State, then and in that event it shall be the duty of the State Treasurer to transfer such money from the suspense account to the proper fund of the State by placing the portion thereof belonging to the State in such fund by the issuance of a deposit warrant. When such deposit warrant or warrants are issued, they shall be entered in the cash book, and the proper fund to which such money is so transferred shall be properly credited therewith. In the event, however, that suit is brought by such taxpayer within the time and within the manner hereinabove provided, and it be finally determined that such money so paid by such taxpayer, or any part thereof, was unlawfully demanded by such public official and that the same belongs to such taxpayer, then and in that event it shall be the duty of the State Treasurer to refund such amount, together with the pro rata interest earned thereon, to such taxpayer by the issuance of a refund warrant, the same to be issued in separate series and to be used for making such refunds, to be styled and designated 'Tax Refund Warrants' and such warrants shall be written and signed by the Comptroller and countersigned by the State Treasurer and charged against the suspense account, as hereinabove provided, and shall then be returned to the Comptroller and delivered by him to the persons entitled to receive the same.

" . . . ."

At the time of the passage of the above statute, the only pertinent statutory provision relating to refunds was contained in the following portion of Article 4388:

"The State Treasurer shall receive daily from the head of each Department, each of whom is specifically charged with the duty of making same

daily, a detailed list of all persons remitting money the status of which is undetermined or which is awaiting the time when it can finally be taken into the Treasury, together with the actual remittances which the Treasurer shall cash and place in his vaults or in legally authorized depository banks, if the necessity arises. . . . A deposit receipt shall be issued by the Comptroller for the daily total of such remittances from each Department; and the cashier of the Treasurer's Department shall keep a cash book, to be called 'suspense cash book', in which to enter these deposit receipts, and any others issued for cash received for which no deposit warrants can be issued, or when their issuance is delayed. As soon as the status of money so placed with the Treasurer on a deposit receipt is determined, it shall be transferred from the suspense account by placing the portion of it belonging to the State in the Treasury by the issuance of a deposit warrant, and the part found not to belong to the State shall be refunded. When deposit warrants are issued, they shall be entered in this cash book, as well as any refunds, and the balance shall represent the aggregate of the items still in suspense. Refunds shall be made in a manner similar to that in present use, except that separate series of warrants shall be used for making such refunds, to be called 'refund warrants', and such warrants shall be written and signed by the Comptroller and countersigned by the Treasurer and charged against the suspense funds to which they apply. Such warrants shall then be returned to the Comptroller and delivered by him to the person entitled to receive them."

Since Section 7 of Article 7057b provides that "the provisions of this law shall be cumulative of all laws relating to the payments of taxes or fees of undetermined status and for the holding thereof in the suspense account fund of the State Treasurer", this department has previously held in Conference Opinion No. 3048 (Opinion No. 0-640), a copy of which is enclosed, that Article 7057b did not repeal Article 4388 and that the two Articles must be construed together.

In Article 4388 the Legislature provided for the handling of money "the status of which is undetermined". In

Article 7057b, it furnished a method for determining the status of taxes paid under protest and for disposing of such taxes upon the culmination of a suit or upon the expiration of the specified period of ninety days. Thus construed, the two Articles are in complete harmony. As was said in the above cited opinion, it is true that:

"Article 4388 covers a broader field than Article 7057b since the first statute relates to money of undetermined status while the latter article deals only with money collected from the enumerated sources whose status has been placed in question by the tax-payer through the statutory protest;"

however, in the area occupied by both of these statues, i.e. cases in which taxes are paid under protest, the latter statute elaborates upon and complements the first statute by providing a mechanism whereby the status of such taxes is to be ascertained. Apart from these two Articles there exists no other pertinent statutory authorization for a refund of taxes paid under protest. It is a familiar canon of construction that:

". . . the express mention or enumeration of one person, thing, consequence or class is tantamount to an express exclusion of all others. And when it is applicable, affirmative words imply a negative of what is not affirmed; negative words imply an affirmative of what is not negative; and a provision limiting a thing to be done in a particular form or manner implies that it shall not be done otherwise." 39 Tex. Jur. 189.

Consequently, it is our opinion that refunds of taxes paid under protest may be accomplished only by compliance with the provisions Article 7057b, and that such refunds may be made only after a judgment favorable to the taxpayer is reached in a suit filed within ninety days from the date of payment "in any court of competent jurisdiction in Travis County, Texas, and none other".

It is true that the Legislature may recognize the right of reimbursement for taxes determined to have been wrongfully demanded and collected under duress and may make appropriations for a refund thereof, as was done in Union

Central Life Insurance Company v. Mann, et al., 158 S. W. (2d) 477 (1941), even though no suit is filed within the ninety day period; but this additional remedy in no way affects the authority of the Comptroller to make a refund prior to a judicial determination that such taxes have been wrongfully demanded and collected.

In view of this answer to the second question stated in the caption, it is neither necessary nor proper for us to answer the first question there stated. Even if we should rule that the carrier in question is exempt from the provisions of the tax statute in question, a suit in which the liability of the carrier would be determined anew by the court would still be necessary before a refund could be made, and we deem it not fitting for us to pass upon a question which will either become moot or will be before the court within ninety days.

Trusting that the foregoing fully answers your inquiries, we are

Very truly yours,

ATTORNEY GENERAL OF TEXAS

By /s/ R. Dean Moorhead
R. Dean Moorhead
Assistant

RDM:mp:mjs
Encl.

APPROVED SEP 29, 1942
/s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

APPROVED OPINION COMMITTEE
BY /s/ BWB, CHAIRMAN